**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Adam Cicciari,<br><br>Plaintiff,<br><br>-v-<br><br>Catholic Health Services of Long Island,<br><br>Defendant. | 2:23-cv-05952 (NJC) (ARL) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Adam Cicciari brings this action against his former employer, Catholic Health Services of Long Island ("Catholic Health"), alleging that the termination of his employment for failure to comply with Catholic Health's COVID-19 vaccination requirements constituted religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the New York State Human Rights Law, New York Executive Law § 290–301 ("NYSHRL"). (Am. Compl., ECF No. 8.)

Before the Court is Catholic Health's Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). (Mot., ECF No. 31.) For the reasons set forth below, Catholic Health's Motion for Summary Judgment is granted as to Cicciari's Title VII claims. Because no federal claims remain in this case, under 28 U.S.C. § 1367(c), this Court declines to exercise supplemental jurisdiction over Cicciari's NYSHRL claim for failure to accommodate on the basis of religion, and this claim is therefore dismissed without prejudice.

## FACTUAL BACKGROUND

### I. New York's 2021 Emergency COVID-19 Vaccine Mandate & 2023 Repeal

On August 26, 2021, the New York State Department of Health ("Department of Health") issued an emergency rule (the "Vaccine Mandate" or "Section 2.61") directing healthcare entities, including hospitals, to "continuously require" certain employees to be fully vaccinated against COVID-19. 10 N.Y. Comp. Codes R. & Regs. Tit. 10, § 2.61(c) (2021) (repealed Oct. 4, 2023); Pl.'s 56.1 Resp ¶ 20. Section 2.61 required the vaccination of:

> all persons employed or affiliated with a covered entity, whether paid or unpaid, including but not limited to employees, members of the medical and nursing staff, contract staff, students, and volunteers, who engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease.

10 N.Y.C.R.R. § 2.61(a)(2) (2021); *see also id.* § 2.61(c). Section 2.61 defined "covered entities" to include "any facility or institution included in the definition of 'hospital' in section 2801 of the Public Health Law, including but not limited to general hospitals, nursing homes, and diagnostic and treatment centers . . . ." 10 N.Y.C.R.R. § 2.61(a)(1)(i) (2021).[1]

Section 2.61 allowed certain medical exemptions to the vaccination requirement. *See* 10 N.Y.C.R.R. § 2.61(d)(1) (2021). It did not, however, contain any "exemption for personnel who oppose vaccination on religious or any other grounds not covered by the medical exemption."

---

[1] Section 2.61 and New York Public Health Law § 2801 are matters of public record of which the Court may take judicial notice in ruling on the pending motion for summary judgment. "[A] court may take judicial notice of 'a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368, 387 (2d Cir. 2025) (citing Fed. R. Evid. 201(b)). "[A]s a general matter, "[j]udicial notice of . . . documents contained in the public record . . . is proper." *Id.* at 388; *see also In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) ("*Fosamax*") ("In ruling on a motion for summary judgment, a district court 'may rely on any material that would be admissible at a trial.'").

*We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 275 (2d Cir. 2021) ("*We The Patriots I*"), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021) ("*We The Patriots II*"). Section 2.61 did not prohibit employers from providing these employees "with a reasonable accommodation that removes the individual from the scope of the Rule." *We The Patriots II*, 17 F.4th at 370.

On October 4, 2023, while a legal challenge to the Vaccine Mandate was pending review before the Appellate Division of the New York Supreme Court, Fourth Department, the Department of Health repealed Section 2.61. 45 N.Y. Reg. 22 (Oct. 4, 2023).

## II. Cicciari's Employment with Catholic Health

Defendant, Catholic Health Services of Long Island, is a not-for-profit corporation that owns and operates an integrated network of hospitals and healthcare facilities serving Nassau and Suffolk Counties.[2] (Abrusci Decl. ¶ 2, ECF No. 22-2.) Catholic Health maintains a team of network engineers to ensure the continuous availability of its wireless IT networks, upon which its hospitals rely "to deliver medical and related services to patients." (Torella Decl. ¶¶ 2–4, 9, ECF No. 22-3.) The network engineers are scheduled such that they are available around-the-clock to detect and restore any disruption to the IT networks. (*Id.* ¶ 5; Cicciari Tr. at 53, ECF Nos. 31-3, 31-19.)

Catholic Health hired Plaintiff Adam Cicciari to work as a network engineer in 2007 and eventually promoted him to the position of senior network engineer. (Cicciari Tr. at 34, 37.) In

---

[2] Those facilities include: Good Samaritan University Hospital (West Islip), Mercy Hospital (Rockville Centre), St. Catherine of Siena Hospital (Smithtown), St. Charles Hospital (Port Jefferson), St. Francis Hospital & Heart Center (Roslyn), St. Joseph Hospital (Bethpage), Catholic Health Ambulatory Care (Centereach, Commack, East Hills, Lake Success, Merrick, Patchogue, Riverhead, West Babylon, and Westbury), Catholic Health Urgent Care (Centereach and Ronkonkoma), Good Samaritan Nursing & Rehabilitation (Sayville), Good Shepherd Hospice (Farmingdale), Our Lady of Consolation Nursing & Rehabilitation (West Islip), and St. Catherine of Siena Nursing & Rehabilitation (Smithtown). (Abrusci Decl. ¶ 4.)

both positions, Cicciari was responsible for monitoring and maintaining the wired and wireless IT networks in Catholic Health's hospitals and other facilities. (Torella Decl. ¶ 9; Cicciari Tr. at 39–47.)[3]

From approximately 2007 to 2015, Cicciari worked in-person directly out of Good Samaritan University Hospital, a Catholic Health facility. (*Id.* at 38.) While stationed at Good Samaritan, Cicciari would also "cover different facilities for other guys or . . . would go to corporate headquarters in Melville," because his responsibilities, which included "maintaining the network" and "troubleshoot[ing] if there's any issues," also extended to other Catholic Health facilities. (*Id.* at 38–39.) While at Good Samaritan, Cicciari was "occasionally" required to enter and walk through patient areas of the hospital to install and work on IT equipment in "network closets" that were located "in hallways . . . on the way to patient areas . . . ." (*Id.* at 40.) Some of the equipment for which Cicciari was responsible was located directly inside patient rooms, although he was often able to work on such equipment remotely or in person when "there [were] no patients in the room." (*Id.* at 42–43.) From approximately 2015 to 2016, Cicciari was stationed at St. Charles Hospital, another Catholic Health facility, where he held the same responsibilities. (*Id.* at 48.)

In around 2016 or 2017, Cicciari was relocated to Catholic Health's corporate headquarters in Melville, where he was stationed for the remainder of his employment. (*Id.* at 51.) His job responsibilities were the same as they had been while at Good Samaritan University Hospital and St. Charles Hospital. (*Id.*) Cicciari also continued to occasionally travel to other

[3] The change in title did not come with a change in job responsibilities. (Torella Decl. ¶ 8; Cicciari Tr. at 37.)

Catholic Health hospitals and healthcare facilities to work on network equipment. (*Id*. at 51–52, 59.)

At the time of the events at issue in this action, which occurred in 2021, Cicciari was one of six network engineers on his team and was supervised by James Torella. (Torella Tr. at 8.) Each month, two team members would be "on call."[4] (Cicciari Tr. at 54.) When questioned in his deposition, Cicciari agreed that Catholic Health needed to have network engineers available and ready to troubleshoot and work on-site at facilities at a moment's notice because the networks required monitoring seven days a week and 24 hours a day. (*Id*. at 53.) He further testified that while most of his work could be conducted remotely from the Melville office, he worked on-site at Catholic Health facilities a "handful" of times per month, which occurred "usually if somebody just needed a hand or if somebody was on vacation" and the facility required assistance.[5] (*Id*. at 51–53.) As Cicciari explained, the network engineers "were always helping out, so you know, I could help out at another hospital, I had been to St. Charles and St. Catherine many times, you know, 'cause I kinda helped out a lot." (*Id*. at 52.)

---

[4] Cicciari attests in his affidavit that only one team member was on-call per month. (Cicciari Decl. ¶ 8.) However, the Court does not consider Ciccari's attestation to create a genuine dispute of material fact on this issue. *See Fosamax*, 707 F.3d at 193 ("[T]he 'sham issue of fact' doctrine . . . prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony."); *see also Rys v. Davis*, No. 25-857, 2026 WL 904990, at *1 (2d Cir. Apr. 2, 2026) (summary order) (same).

[5] Cicciari also attempts to refute this testimony by attesting in his declaration: "All checks were done remotely and 99% of the repairs were done remotely. It was an extremely rare occasion that one of my team members would have to go to a hospital." (Cicciari Decl. ¶ 8.) However, under the "sham issue of fact" doctrine, Cicciari may not rely on his declaration to contradict his sworn deposition testimony that he worked on-site a "handful" of times per month. *See* footnote 4 *supra*.

Similarly, Torella testified that various network engineering team members were typically required to work on-site at a hospital a "couple times a week," but that the frequency was variable. (Torella Tr. at 21.) Tasks that could only be completed on-site included "replacement of failed equipment" and "working with hospital staff on troubleshooting any issues they may have." (*Id*. at 28.) Torella confirmed that on-site work was done in "closets that are on the nursing units," "the data centers at the hospital," and "in the patient rooms." (*Id*. at 29.)

One member of Cicciari's team, Brendan Curtain, was permitted to work remotely due to a medical condition; notwithstanding this accommodation, however, Curtain was not exempted from his in-person, on-call duties and was periodically required to work on-site at Catholic Health hospitals like the rest of his colleagues. (*See* Cicciari Tr. at 108–109.) Torella testified in deposition that his team could not operate with fewer than six members available to work on-site at a Catholic Health facility:

> Q. . . . [D]id the workload, in terms of network engineering, require having [6] members who were available at all times to go on site to hospitals?
>
> A. Right. And the reasoning is because of any unknown or unforeseen issues that could arise that would require full staff to remediate those issues.
>
> Q. . . . Do you believe that you could have safely operated and provided a level of services required in network engineering in 2021 and 2022 if two of your team members were unable, under any circumstances, to go into a hospital on site?
>
> A. No.
>
> Q. And why was that?
>
> A. Because we don't know what issues could arise at any point. And that's the requirement for the size of team we have.

(Torella Tr. at 25.) Several years prior to the events in question in 2021, Cicciari's team had previously consisted of only four members but was at some point increased to six due to the workload. (*Id*. at 29; Cicciari Decl. ¶ 3.)

Shortly after the Vaccine Mandate became effective in 2021, Catholic Health notified Cicciari that he would need to receive the first dose of the COVID-19 vaccine by September 27, 2021. (Abrusci Decl. ¶¶ 10–11.) Catholic Health warned Cicciari that failure to comply would result in the termination of his employment. (*Id*. ¶ 12.)

On November 4, 2021, the Second Circuit vacated the Northern District of New York's preliminary injunction enjoining enforcement of the Vaccine Mandate. *We The Patriots I*, 17 F.4th at 296. After that decision, in around November 2021, Cicciari submitted to Catholic Health Human Resources a request for a religious exemption or accommodation. (Cicciari Tr. at 65–66; *see also* Religious Accommodation Letter, ECF No. 8-1.) Cicciari's letter request stated in part:

> I am writing to request <u>a religious exemption</u> from the covid vaccination. During the pandemic CH thought it was ok to risk my wellbeing and I was forced to come in to Melville from day 1 despite the fact that most of my job can be done remotely and a majority of other employees got to work from home. Days after the pandemic was declared I was forced to go into a hospital to do a non-urgent closet upgrade that was supposed to be completed months earlier by a team member of mine but it was not. Again there was no thought of my wellbeing when I was forced to go in. From day 1 until either late July or early August there was no mask mandate in Melville, you rarely saw anyone wearing a mask inside OCR aside from coming into the building or leaving the building for the commute and this included upper and lower management. . . .
>
> . . . As I stated I rarely get sick and rarely takes [sic] medicine so I'm not looking to put anything unnecessary into my body in general. Since May last year, aside from being forced to work in the office, I've been in trains, planes and automobiles to travel to 10 different states, to go to parties and barbeques. . . . If there was anyone more exposed to danger than most it would have been me and I have not even been sick. So to put something unneeded into my body and risk possible damage to the temple that God gave me is unwarranted. He gave me control of my body, not anyone else so the decision should be mine. . . . While researching the covid vaccine I've read about fetal materials being used for them. I am highly offended and against the process, the source and the use

> of any fetal material in anything! There is no way I would condone anything with the thought of hurting, killing or using a fetus aside from bearing a child and there is no way I want that in my body.
>
> Whatever risks there still may be they are mine to face. . . . I should have the option to be tested if I don't want the vaccine.

(ECF No. 8-1 (emphasis added).) As shown above, Cicciari's letter requested a "religious exemption" from the COVID-19 vaccination requirement and the opportunity to test for COVID-19 instead.[6] *See id*.

Upon receipt of Cicciari's request, Assistant Vice President of HR Donna Abrusci spoke with Cicciari's supervisor, James Torello, to "review his job duties . . . to see if we would be able to grant an accommodation." (Abrusci Tr. at 22; Abrusci Decl. ¶ 1.) The pair concluded that Cicciari's job responsibilities "required him to go into the hospital and perform IT duties," "[t]hat role could not be performed remotely," and "[t]herefore, we could not accommodate his request." (Abrusci Tr. at 11, 22–23.)

From September to December 2021, Catholic Health extended Cicciari's deadline to become fully vaccinated several times. (Abrusci Decl. ¶ 13.) The final deadline for Cicciari to become vaccinated was December 14, 2021. (*Id.* ¶ 14.) Cicciari never received any dose of the COVID-19 vaccine. (*Id.* ¶ 15; Cicciari Tr. at 62.)

Catholic Health terminated Cicciari's employment on December 14, 2021. (Abrusci Decl. ¶ 16.) Another member of Cicciari's team, Jason Dunn, was also terminated for failure to receive the COVID-19 vaccine. (Cicciari Tr. at 79; Torella Tr. at 9, 20.)

[6] The record does not show that Cicciari ever actually requested a remote work accommodation, nor does Cicciari assert that he did. (*See* Pl.'s 56.1 Resp.)

## PROCEDURAL HISTORY

Cicciari filed the Amended Complaint on December 14, 2023. (ECF No. 8.) On December 2, 2024, Catholic Health filed a letter request for a conference regarding an anticipated motion for summary judgment, as well as an accompanying Rule 56.1 Statement and supporting evidentiary submissions. (ECF No. 16.) Cicciari filed a response to the request, a Rule 56.1 Counterstatement, and supporting evidentiary submissions on January 6, 2025. (ECF No. 20.) On January 22, 2025, the Court waived the pre-motion conference requirement and ordered briefing on the motion for summary judgment. (Elec. Order, Jan. 22, 2025.)

On April 30, 2025, Catholic Health's fully-briefed motion for summary judgment was filed on the docket pursuant to the Court's recommended bundling procedure. (ECF No. 31.) The submission contained the following documents:

- Catholic Health's motion for summary judgment ("Mot.," ECF No. 31-8);
- Catholic Health's Rule 56.1 Statement (ECF No. 31-1);
- the Affirmation of Roy W. Breitenbach, counsel for Catholic Health, attaching the following exhibits (ECF No. 31-2):
    - excerpts from the transcript of the deposition of Adam Cicciari ("Cicciari Tr.," ECF No. 31-3);
    - excerpts from the transcript of the deposition of James Torella ("Torella Tr.," ECF No. 31-4);
    - a June 4, 2007 employment offer letter from Catholic Health to Cicciari (ECF No. 31-5);
    - an undated PDF document from the New York State Department of Health on "Frequently Asked Questions (FAQs) Regarding the Prevention of COVID-19 Transmission by Covered Entities Emergency Regulation" (ECF No. 31-6); and
    - excerpts from the transcript of the deposition of Donna Abrusci ("Abrusci Tr.," ECF No. 31-7).

- Plaintiff's brief in opposition to the summary judgment motion (ECF No. 31-9);
- Plaintiff's Rule 56.1 Counterstatement (ECF No. 31-11);
- the Affirmation of James G. Mermigis, counsel for Plaintiff, attaching the following exhibits (ECF No. 31-10);
  - the Declaration of Adam Cicciari ("Cicciari Decl.," ECF No. 31-12);
  - excerpts from the transcript of the deposition of Adam Cicciari ("Cicciari Tr.," ECF No. 31-13);
  - excerpts from the transcript of the deposition of James Torella ("Torella Tr.," ECF No. 31-14);
  - excerpts from the transcript of the deposition of Donna Abrusci ("Abrusci Tr.," ECF No. 31-15); and
  - a November 15, 2021 letter from the New York State Department of Health to chief executive officers and administrators of covered entities regarding reasonable accommodations (ECF No. 31-16).

Additionally, on May 1, 2025, Catholic Health filed two declarations from James Torella and Donna Abrusci. ("Torella Decl.," ECF No. 32; "Abrusci Decl.," ECF No. 32-1.)[7]

**JURISDICTION**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Cicciari brings claims under a federal statute, 42 U.S.C. § 2000e-2. The Court has supplemental jurisdiction over the state law claim alleged in the Amended Complaint under 28 U.S.C. § 1367(a) because the New York State Human Rights Law claim for failure to

[7] Cicciari filed a letter to strike Catholic Health's late-filed submissions (ECF No. 33), which this Court denied in light of the fact that the same evidentiary submissions had also been filed several months prior with Catholic Health's pre-motion conference request, thereby ensuring that Cicciari already had notice of the submissions and Catholic Health's intention to rely on them in moving for summary judgment (Elec. Order, May 9, 2025). The Court concluded that Cicciari had not shown that he would suffer any prejudice from admission of the submissions, which were filed one day late. (*Id.*)

accommodate is part of the same case or controversy as the federal claims.

Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b)(1) because Defendant Catholic Health maintains a principal place of business in Rockville Centre, New York, which is located within this District. (Am. Compl. ¶ 11.)

## LEGAL STANDARDS

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a material question of fact. *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022).[8] "A fact is material if it might affect the outcome of the suit under the governing law." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), *rev'd on other grounds,* 604 U.S. 693 (2025). A dispute of "material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In order to defeat summary judgment, the non-moving party must set forth sufficient facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c). Under this standard, if the movant meets its burden, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial" in order to avoid summary judgment. *McKinney*, 49 F.4th at 745–46. The non-moving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *FTC v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019); *see also Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-cv-1220, 2024 WL 3264125, at *2 (summary order) (2d Cir. July 2, 2024).

---

[8] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

"Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

A court considering whether summary judgment is appropriate "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Cunningham*, 86 F.4th at 980; *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 (2d Cir. 2024) ("We may find for the movant . . . only if we conclude that on the record presented, considered in the light most favorable to the non-movant . . . no reasonable jury could find in the [non-movant]'s favor."). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983); *see also Jones v. City of New York*, 603 F. App'x 13, 14 (2d Cir. 2014) (summary order) (holding that summary judgment must be denied "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

## DISCUSSION

Catholic Health moves for summary judgment on all of Cicciari's claims, which are brought under Title VII and the NYSHRL. For the reasons set forth below, the Court grants summary judgment to Catholic Health on Cicciari's Title VII claims and dismisses Cicciari's NYSHRL claim without prejudice.

### I. Title VII Claims

#### A. Religious Discrimination Claim

Where a party is represented, "a court may, when appropriate, infer from [that] party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Farag v. XYZ Two Way Radio Serv., Inc.*, No. 22-cv-1795, 2023 WL 2770219, at *2 (2d Cir.

Apr. 4, 2023) (citing *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014)); *see also Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 257 (2d Cir. 2024) (finding that a plaintiff "abandoned . . . claims" that she failed to argue in response to a summary judgment motion). Accordingly, the Second Circuit has held that "when a counseled party moves for summary judgment, a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016).

The first cause of action set forth in the Amended Complaint is titled: "Violation of Title VII of the Civil Rights Act of 1964 Disparate Treatment/Failure to Accommodate on the Basis of Religion (42 U.S.C. § 2000e, et seq.) against Defendants." (Am. Compl. at 6.) Catholic Health argues for summary judgment on Cicciari's Title VII claim that the termination of his employment in 2021 constituted disparate treatment based on religion. (Mot. at 5–6.) However, Cicciari fails to oppose Catholic Health's arguments regarding any Title VII disparate treatment claim. (*See generally* Opp'n; *see also id*. at 3 ("This is an action for failure to grant a religious accommodation in violation of Title VII of the Civil Rights Act of 1964 . . . .").) Thus, to the extent the Amended Complaint brought any such claim, Cicciari has abandoned it by arguing against summary judgment on his Title VII failure-to-accommodate claim while failing to provide any opposition to Catholic Health's request for summary judgment on any Title VI disparate treatment claim. *See Kovaco*, 834 F.3d at 143.

**B. <u>Failure-to-Accommodate Claim</u>**

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1); *see also We The Patriots I*, 17 F.4th at 291. An employer may be held liable under Title VII for failing "to accommodate the religious practice of their employees unless doing so would impose an undue hardship on the conduct of the employer's business." *Groff v. DeJoy*, 600 U.S. 447, 453–54 (2023) (citing 42 U.S.C. § 2000e(j)).

In the Second Circuit, courts apply a two-step framework when assessing a claim for failure to accommodate religion. *Bergin v. New York State Unified Ct. Sys.*, ___ F.4th ___, No. 25-721, 2026 WL 2724974, at *3 (2d Cir. Sept. 15, 2026). First a court must "ask whether the plaintiff has stated a 'prima facie case' of religious discrimination," and if the plaintiff has done so, second, the court must "determine whether the employer 'offer[ed] him or her a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship.'" *Id.* (internal citations omitted). As the Second Circuit recently clarified in *Bergin v. New York State Unified Court System*:

> [T]o state a prima facie case of failure to accommodate a religious belief or practice under Title VII, a plaintiff must demonstrate (1) that she actually required an accommodation of her religious practice, and (2) that the employer's desire to avoid the actually required prospective accommodation was a motivating factor in (3) an adverse employment decision.

2026 WL 2724974, at *5.

Cicciari claims that he "applied for a religious accommodation to the covid-19 mandate," and that Catholic Health denied him any accommodation.[9] (Am. Compl. ¶ 16.) Specifically,

---

[9] Cicciari correctly recognizes that "the Second Circuit [has] held that healthcare workers were not entitled to a religious *exemption* under the law," and accordingly is not claiming that he was entitled to a religious exemption from the Vaccine Mandate. Am. Compl. ¶ 16 (citing *We The Patriots I*, 17 F.4th at 275); *see also Conde v. Mid Hudson Reg'l Hosp. Med. Ctr.*, No. 22-cv-3085, 2024 WL 168282, at *7–8 (S.D.N.Y. Jan. 12, 2024) (explaining the distinction between

Cicciari maintains that he should have been permitted to work remotely or, in the alternative, that Catholic Health should have considered alternative accommodations, although he does not suggest any specific alternative accommodations that he should have received. (Opp'n at 10–15.)

Here, Catholic Health does not address the prima facie case requirements and focuses its summary judgment argument exclusively on the second prong of the failure-to-accommodate analysis: whether offering Cicciari an accommodation of remote work, testing, or some other unidentified alternative would cause Catholic Health to suffer an undue hardship. (Mot. at 7–13.) Catholic Health contends that based on the undisputed facts, there is no genuine dispute of material fact that Cicciari's proffered accommodations would have caused Catholic Health an undue hardship. (*See id.*)

Here, it is not clear that Ciccari has identified evidence that either meets each prong of the prima facie case or, as is his lesser burden on summary judgment, raised a genuine dispute of material fact as to each element of the prima face case for a Title VII failure-to-accommodate claim. However, the Court need not resolve this question because even assuming that Ciccari has at least raised a genuine dispute of material fact as to the prima facie case for a claim of failure to accommodate on the basis of religion, he has failed to meet his burden to identify any evidence creating a material question of fact as to the second prong of the failure-to-accommodate

---

religious accommodations and religious exemptions for Title VII purposes). As this Court has explained, an exemption "would have posed an undue hardship to [defendants] by requiring them to violate the Department of Health's vaccination requirement set forth in Section 2.61." *Brown v. S. Shore Univ. Hosp.*, 762 F. Supp. 3d 191, 208 (E.D.N.Y. 2025); *see also Greenberg v. Visiting Nurse Servs. in Westchester, Inc.*, No. 23-cv-4252, 2024 WL 4252550, at *7 (S.D.N.Y. Sept. 19, 2024) ("A veritable chorus of federal courts in New York have consistently dismissed . . . Title VII claims against healthcare employers that instituted policies consistent with the COVID-19 Vaccine Mandate on the basis that granting employees religious exemptions would have created an undue hardship on the employer by forcing them to violate § 2.61.") (collecting cases).

analysis. Rather, the record demonstrates that Cicciari's suggested accommodations of fully remote work or testing and masking would impose an undue hardship on Catholic Health. Moreover, Cicciari's assertion that any unspecified other alternatives would not cause Catholic Health an undue hardship has no support in the record. Thus, Catholic Health has met its burden for summary judgment on the Title VII failure-to-accommodate claim.

#### i. *A Fully Remote Work Accommodation or the Alternative of Exemption from Vaccination Would Impose an Undue Hardship* to Catholic Health

As discussed above, Title VII "requires employers to accommodate the religious practice of their employees unless doing so would impose an undue hardship on the conduct of the employer's business." *Groff*, 600 U.S. at 453–54. In *Groff*, the Supreme Court clarified that "undue hardship is shown when a burden is *substantial in the overall context of an employer's business*." *Id*. at 468 (emphasis supplied).

In determining whether a given religious accommodation imposes a substantial burden on an employer, "courts must . . . take[ ] into account all relevant factors in the case at hand, including *the particular accommodations at issue* and their practical impact in light of the nature, size and operating cost of an employer." *Id*. at 470–71 (emphasis added). An employer satisfies the "undue hardship" standard when it has shown that granting a religious accommodation "would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 470. *Groff* observed that "an accommodation's effect on co-workers may have ramifications for the conduct of the employer's business." *Id*. at 472.

As a threshold matter, Catholic Health has shown that it was subject to the Vaccine Mandate during the events at issue with respect to Cicciari's Title VII failure-to-accommodate

claim. Prior to its repeal,[10] Section 2.61 applied to all "covered entities" which included "any facility or institution included in the definition of 'hospital' in section 2801 of the Public Health Law, including but not limited to general hospitals, nursing homes, and diagnostic and treatment centers." 10 N.Y.C.R.R. § 2.61 (2021). Catholic Health is a New York not-for-profit corporation that operates a network of hospitals and other healthcare facilities throughout Long Island. (Abrusci Decl. ¶¶ 2–4.) These facilities all squarely fall within the "covered entities" definition, and Cicciari does not introduce any evidence to the contrary. In light of the healthcare services that these facilities provide, Catholic Health is subject to the regulations of the New York State Health Department. (*Id.* ¶ 5.)

Cicciari also falls within the Vaccine Mandate's definition of "personnel" at a covered entity, which includes:

> all persons employed or affiliated with a covered entity, whether paid or unpaid, including but not limited to employees, members of the medical and nursing staff, contract staff, students, and volunteers, who engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease.

10 N.Y.C.R.R. § 2.61(a)(2) (2021). At the time of the relevant events in 2021, Cicciari was employed as a senior network engineer by Catholic Health. (Cicciari Tr. at 34, 37.) He was one of six network engineering team members. (Torella Tr. at 8.) At that time, he was stationed at, and worked primarily out of, Catholic Health's corporate headquarters located in Melville, New York, but carried out responsibilities that required periodically working on-site at Catholic Health hospitals and other facilities to check and repair network equipment and access points.

---

[10] Catholic Health correctly points out that the Vaccine Mandate's 2023 repeal has no bearing on this Court's analysis in light of the fact that the relevant events occurred in 2021 when the Mandate was in effect. (Mot. at 8 n. 3 (citing *D'Cunha v. Northwell Health Sys.*, No. 23-476-cv, 2023 WL 7986441 at *3 n.4 (2d Cir. Nov. 17, 2023)).)

(Cicciari Tr. at 48, 51–52.) Access points were located at various places in each hospital, including spaces where patients were located, such as closets in patient hallways, cafeterias, and even patient rooms.[11] (*Id.* at 40; Torella Tr. at 29.) Accordingly, when traveling to and from access points for network equipment in Catholic Health hospitals, Cicciari encountered other covered personnel, including medical and nursing staff. *See* 10 N.Y.C.R.R. § 2.61(a)(2) (2021). Therefore, Cicciari's job responsibilities as a Catholic Health network engineer included "activities" in which he too "could potentially expose other covered personnel, patients or residents" to COVID-19 if he were infected with it. 10 N.Y.C.R.R. § 2.61(a)(2) (2021). Accordingly, Catholic Health was required to ensure that Cicciari received the COVID-19 vaccine. *See We The Patriots II*, 17 F.4th at 370 ("To repeat: if a medically eligible employee's work assignments mean that she qualifies as 'personnel,' she is covered by the Rule and her employer must 'continuously require' that she is vaccinated against COVID-19."); *Greenberg v. Visiting Nurse Servs. In Westchester, Inc.*, No. 23-cv-4252, 2024 WL 4252550, at *8 (S.D.N.Y. Sept. 19, 2024) (plaintiff "plainly did fall under that definition" of personnel even though her duties were exclusively administrative "because she was not exclusively remote and trained other . . . employees").

[11] Cicciari disputes the fact that access points in Catholic Health facilities were at times located in patient spaces by arguing that his testimony on this issue related only to his responsibilities from 2007 to 2015, when he was stationed at Good Samaritan University Hospital. (Pl.'s 56.1 Resp. ¶ 15.) However, there is no dispute that Cicciari performed work in Catholic Health hospitals when needed in 2021, even after he was moved to corporate headquarters because, as Cicciari himself testified, his job responsibilities did not change. (Cicciari Tr. at 51.) And Cicciari does not identify any evidence suggesting that the layout of Catholic Health hospitals, including Good Samaritan University Hospital, had changed by 2021. Thus, Cicciari has failed to "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial" as to whether he was occasionally required to work on-site in Catholic health hospitals in spaces where patients could be located as a part of his job responsibilities as senior network engineer in 2021. See *McKinney*, 49 F.4th at 745–46.

For these reasons, other courts in this Circuit have found that employees in roles similar to Cicciari's role as a senior network engineer—including other Catholic Health employees—qualify as "covered personnel" for the purposes of Section 2.61. *See Chiechi v. Cath. Health Servs. of Long Island*, No. 23-cv-3118, 2026 WL 2559568, at *11 (E.D.N.Y. Aug. 31, 2026) ("The undisputed facts establish that [plaintiff Chiechi] fell within the Mandate's definition of covered personnel. Although his role was non-clinical, he regularly accessed hospital buildings and encountered clinical staff and patients while traveling to and from data rooms."); *Algarin v. NYC Health + Hosps. Corp.*, 678 F. Supp. 3d 497, 509 (S.D.N.Y. 2023) ("Even though Plaintiff does not work with patients, Plaintiff qualifies as 'personnel' for purposes of Section 2.61, given that he admittedly worked on site at H+H with co-workers."), *aff'd sub nom. Algarin v. New York City Health & Hosps. Corp.*, No. 23-1063, 2024 WL 1107481 (2d Cir. Mar. 14, 2024).[12] Courts have reached this conclusion even where the plaintiff is not a patient-facing professional, such as a doctor or a nurse, and instead occupies a position within the hospital system that does not involve patient care or contact. *See, e.g.*, *Chiechi*, 2026 WL 2559568, at *11; *Algarin*, 678 F. Supp. 3d at 509; *Haczynska v. Mount Sinai Health Sys., Inc.*, 738 F. Supp. 3d 300, 309 (E.D.N.Y. 2024) (plaintiffs' duties "were primarily 'administrative and involved paperwork and audits . . . in a lab environment, which did not involve patient care or contact"); *Greenberg*, 2024 WL 4252550, at *1, *7 (plaintiff was subject to Vaccine Mandate where their responsibilities "consisted 'entirely of office work'" but also involved "provid[ing] training to various colleagues, including 'field staff'"); *Corrales v. Montefiore Med. Ctr.*, No. 22-cv-3219, 2023

[12] Also of note, the plaintiff in *Chiechi* did not dispute that Catholic Health was a "covered entity" within the meaning of Section 2.61. *See Chiechi*, 2026 WL 2559568, at *10.

WL 2711415, at *2, 6 (S.D.N.Y. Mar. 30, 2023) (plaintiff was an assistant to an executive and "did not interact with hospital patients" but was subject to Vaccine Mandate).

Next, the undisputed evidence in the record—including evidence from Cicciari's own deposition testimony—shows that permitting Cicciari to work remotely would have imposed an undue hardship on Catholic Health by exempting him from his duties to perform work on-site at Catholic Health facilities. The nature of network engineering work at Catholic Health hospitals requires IT personnel to be on-call at all hours, as emergencies can arise at any hour of the day or any day of the week. (Torella Decl. ¶¶ 2–5, 9.) Accordingly, each month, two members of Cicciari's team were designated to be "on call" and were responsible for any emergencies. (Cicciari Tr. at 54.) While those emergencies could often be resolved remotely, they occasionally required the on-call team member to work on-site at a Catholic Health hospital. (*Id*. at 51–55; Torella Tr. at 21, 28.) Cicciari testified in deposition that when he was stationed at the Melville corporate office, he would enter hospital facilities "a handful" of times per month, which occurred "[u]sually if somebody just needed a hand or if somebody was on vacation and . . . they needed something." (Cicciari Tr. at 53.) Indeed, Cicciari's own letter to Catholic Health requesting a religious exemption and accommodation states, "Days after the pandemic was declared I was forced to go into a hospital to do a non-urgent closet upgrade." (Religious Accommodation Letter.) Cicciari was one of only six network engineers on his team. (Torella Tr. at 8.) Thus, permitting him to work fully remotely in 2021 would have left only five network engineers for any in-person network emergencies at Catholic Health facilities, whether the Melville corporate headquarters, hospitals, or other healthcare facilities.

Torella, Cicciari's supervisor, testified about the requests from Cicciari and Jason Dunn, another network engineering team member, for religious exemption or accommodation from the Vaccine Mandate:

> Q. Do you believe that you could have safely operated and provided a level of services required in network engineering in 2021 and 2022 if two of your team members were unable, under any circumstances, to go into a hospital on site?
>
> A. No.
>
> Q. And why was that?
>
> A. Because we don't know what issues could arise at any point. And that's the requirement for the size of team we have.

(*Id*. at 25.) Torella also testified that, in light of the workload, the network engineer team had been intentionally increased from four to six members. (*Id*. at 29.) Although one of Cicciari's colleagues (Brendan Curtain) was permitted to work remotely due to a medical condition, Cicciari confirmed in deposition that Curtain was still required to periodically work on-site at Catholic Health hospitals like the rest of his colleagues. (*See* Cicciari Tr. at 108–109 (Q. "There [were] five people on the rotation, the gentleman with asthma would . . . not be able to go on site if there was an emergency off hours, correct?" A. "Technically, I know he did go in, you know, a handful of times, not necessarily on call, but I know he did do some stuff in the field . . . .").) Similarly, Torella, who supervised both Cicciari and Curtain, testified in deposition that Curtain "was remote, but . . . had the capability of being on site when called upon." (Torella Tr. at 8, 11.) Thus, the undisputed record viewed in the light most favorable to Cicciari shows that even Curtain, who was permitted to work remotely due to a medical condition, was both capable of being sent to work on-site and did in fact work on-site at Catholic Health facilities, which supports the conclusion that permitting Cicciari to work fully remotely would have imposed an undue hardship on Catholic Health.

Moreover, courts in this Circuit have found that granting a hospital employee—even one working in information technology—a remote work accommodation during the COVID-19 pandemic would result in an undue hardship on a hospital defendant. *See, e.g.*, *Chiechi*, 2026 WL 2559568, at *11 ("Even assuming there had not been a catastrophic technological failure during plaintiffs' tenures that would require their onsite assistance, it was reasonable for defendant to require that plaintiffs remained available to respond onsite in the future if necessary."). Specifically, several courts have found undue hardship because a remote work accommodation would require the defendant to hire another replacement employee for the in-person duties. *See, e.g.*, *Barbour v. Northwell Health*, No. 22-cv-06409, 2025 WL 3640551 at *5 (E.D.N.Y. Dec. 16, 2025); *Conde*, 2024 WL 168282, at *8; *Brown v. S. Shore Univ. Hosp.*, 762 F. Supp. 3d 191, 214 (E.D.N.Y. 2025); *Greene v. Northwell Health Inc.*, 2024 WL 4287875, at *17 (E.D.N.Y. Sept. 25, 2024).

Finally, although Cicciari's opposition brief is unclear as to whether he sought an exemption from COVID-19 vaccination as a form of accommodation for his religious objection, Cicciari's letter request expressly stated that he was seeking an exemption. (Religious Accommodation Letter.) As discussed in footnote 9 *supra*, the Second Circuit has expressly recognized that exempting an employee from the Vaccine Mandate would impose an undue hardship on the employer defendant. *D'Cunha*, 2023 WL 7986441 at *2 (affirming the district court's decision that "the sole religious accommodation sought by Plaintiff—an exemption from the COVID-19 vaccination requirement while continuing to provide direct patient care as a resident—would have imposed an undue hardship on Defendant because it would have required it to violate the [NYSDOH] Mandate . . . ."); *see also We The Patriots I*, 17 F.4th at 292 ("Title VII does not require covered entities to provide . . . a blanket religious exemption allowing

[plaintiffs] to continue working at their current positions unvaccinated."). As noted in numerous cases, covered entities, including hospitals like Catholic Health, were required to comply with the Vaccine Mandate or risk serious consequences. *See Brown,* 762 F. Supp. 3d at 210 (collecting cases). The Vaccine Mandate did not permit religious exemptions—only medical exemptions. *See* 10 N.Y.C.R.R. § 2.61(d)(1) (2021). Thus, to the extent that Cicciari argues that the denial of his request for an exemption supports a Title VII failure-to-accommodate claim, the undisputed record shows that Catholic Health's grant of such a request would have exposed it to serious penalties, which undeniably constitute a substantial hardship on the conduct of its business.

***ii. Cicciari Fails to Identify Evidence Raising a Genuine Dispute of Material Fact as to Undue Hardship***

Cicciari makes four principal arguments in opposition to the motion for summary judgment. None are persuasive.

First, Cicciari argues that the Melville corporate headquarters where he worked was not a "covered entity" within the meaning of the Vaccine Mandate. (Opp'n at 12.) For the reasons explained above, Cicciari's reading of the Vaccine Mandate is incorrect. It is true that the office building where he primarily worked was not, itself, a hospital or other healthcare facility—but that is not the test under the Vaccine Mandate. Rather, the question as to whether the Vaccine Mandate applied to Cicciari is twofold. First, the court must determine whether Catholic Health's various hospitals and facilities were "covered entities" such that Catholic Health was required to ensure that all personnel at those entities were vaccinated. Second, the court must determine whether Cicciari fell within the definition of "personnel" during his 2021 employment as a senior network engineer for Catholic Health. With regard to the first question, Cicciari does not dispute that Catholic Health hospitals clearly fell within the scope of the Vaccine Mandate. With regard

to the second, the definition of "personnel" applies to Cicciari because it includes "all persons *employed or affiliated with* a covered entity." 10 N.Y.C.R.R. § 2.61(a)(2) (2021) (emphasis added). The fact that Cicciari was not directly employed by any specific hospital in the Catholic Health network is immaterial. It is undisputed that, as an employee of Catholic Health, which owns and operates these hospitals, Cicciari was periodically required to work on-site at various Catholic Health facilities, including hospitals, in order to execute his job responsibilities of monitoring and maintaining the wired and wireless IT networks in these facilities.[13] (Cicciari Tr. at 51–55.) Therefore, there is no genuine dispute of material fact as to whether Cicciari fell outside the definition of "personnel" subject to the Vaccine Mandate when employed by Catholic Health in 2021.

Second, Cicciari points to Chris Pierce and Brendan Curtain as purported comparators who were allegedly granted the same fully remote work accommodation that he requested. (Opp'n at 9–10.) However, Cicciari fails to identify evidence in the record raising a genuine dispute of material fact as to whether either Pierce or Curtain were similarly situated to him in their job responsibilities. By Cicciari's own admission, Pierce was not on Cicciari's team. (Cicciari Decl. ¶ 18.) According to Torella, Pierce was not a network engineer, but worked "for

[13] Cicciari asserts, without providing any factual support, that he was only on call "2 to 3 months a year." (Opp'n at 12.) Even assuming that this were true, however, this fact is immaterial. Catholic Health has demonstrated that it needed network engineering coverage year-round, and that on-site assistance was required every month. (Torella Decl. ¶¶ 2–5; Torella Tr. at 20–21; Cicciari Tr at 53–54.) During his deposition, Cicciari agreed with the statement that the Catholic Health system required network engineering coverage seven days a week and 24 hours each day. (Cicciari Tr. at 53–54.) Additionally, it is undisputed that Catholic Health's hospitals and facilities "depend on the continuous availability of [its] IT networks to provide necessary medical services to patients" and that its network engineers, like Cicciari, are responsible for "ensur[ing] the continuous availability of these IT networks." (Pl.'s 56.1 Resp. ¶¶ 6–7.)

the infosecurity team," and Torella did not supervise him.[14] (Torella Tr. at 15.) Cicciari fails to point to any evidence in the record raising a genuine dispute as to whether Pierce was permitted to work fully remotely despite having job responsibilities to handle emergencies on-site at Catholic Hospital facilities. Thus, he fails to show how Catholic Health's grant of a fully remote work accommodation to Pierce raises a material question of fact as to whether the same accommodation for Cicciari, who worked as a senior network engineer with the responsibility to engage in periodic on-site work, would have not imposed an undue hardship on Catholic Health.

Nor does evidence relating to Curtain call into question the conclusion that Cicciari's desired accommodation of fully remote work would impose an undue hardship on Catholic Health. As discussed earlier, the undisputed facts show that Curtain was not exempt from his duties to work on-site at hospitals, whether during the exercise of on-call duties or otherwise, even though he was generally permitted to work remotely. (Cicciari Tr. at 108–109; Torella Tr. at 8, 11.) Thus, even if Catholic Health had granted Cicciari the same accommodation that Curtain received, Cicciari would still have been required to work on-site at Catholic Health hospitals from time to time, and therefore would have been required to be vaccinated against COVID-19 under the terms of the Vaccine Mandate. Moreover, evidence in the record shows that another member of Cicciari's network engineer team *also* declined to comply with the Vaccine Mandate and was terminated for noncompliance. (Cicciari Tr. at 79; Torella Tr. at 9, 20.) Therefore, even drawing all inferences in Cicciari's favor, Cicciari fails to show that either

[14] Cicciari asserts that Pierce was on the "network server" team but does not cite to any support in the record for this fact. (Opp'n at 6.) Cicciari also makes the conclusory and unsupported statement that "Pierce was able to perform the essential function [sic] of his job working from another state." (*Id*. at 10.) The Court affords no weight to these unsupported assertions. *See Moses*, 913 F.3d 297 at 305 (prohibiting the non-moving party from defeating summary judgment through reliance on "mere speculation or conjecture as to the true nature of the facts).

Pierce or Curtain serves as a comparator such that the grant of a remote work accommodation to them creates a genuine dispute of material fact as to whether a fully remote work accommodation for Cicciari would have placed an undue hardship on Catholic Health.

Third, Cicciari relies on the Supreme Court's decision in *Groff*, 600 U.S. 447, to argue that Catholic Health failed to consider any alternative accommodations to his request for exemption from the COVID-19 vaccination requirement or an alternative of testing and masking. (Opp'n at 10, 14.) In *Groff*, the Supreme Court held that the Third Circuit erred in finding that a grant of the plaintiff's requested accommodation of exemption from Sunday work would impose an undue hardship on the employer without accounting for possible accommodations that would not have imposed an undue hardship. 600 U.S. at 473. Cicciari maintains that Catholic Health must have considered additional alternatives to his requests for a religious exemption or a testing and masking accomodation while remaining in the senior network engineer role. However, Catholic Health *did* consider an alternative accommodation that Cicciari did not suggest in his letter to Catholic Health: remote work. (Religious Accommodation Letter.) The record shows that while Cicciari never actually made an explicit request for a remote work accommodation, Catholic Health considered its feasibility nonetheless. (Abrusci Tr. at 11 ("[T]he decision [to terminate Cicciari] was based upon the job description and what was required of the employee in their role. So Adam's role was to go into the hospital and perform IT work. *That role could not be performed remotely*. Therefore, we could not accommodate his request." (emphasis added)).) Cicciari fails to identify any other reasonable alternatives that Catholic Health should have considered.

While Cicciari's letter requesting a religious accommodation indicates that he sought "to be tested" as an alternative to being vaccinated, this request boils down to a request for an

exemption from the Vaccine Mandate because, for the reasons already addressed, Cicciari fell within the definition of "personnel" of a covered entity within the terms of the Vaccine Mandate. Religious Accommodation Letter; *see* Discussion Section I.B.i *supra*. Even if Cicciari was undergoing regular COVID-19 testing, he still could have "potentially expose[d] other covered personnel, patients or residents to the disease" when working on-site at Catholic Health hospitals as part of his senior network engineer responsibilities. 10 N.Y.C.R.R. § 2.61(a)(2) (2021). Thus, testing was not an alternative accommodation, but a request for a religious exemption from the Vaccine Mandate, which was prohibited. And, as addressed, were Catholic Health to have granted such an exemption, it would have imposed an undue burden on the conduct of its business of providing healthcare to patients. *See Wright v. Brooklyn Hosp. Ctr.*, No. 24-2632, 2026 WL 1141057, *2 (2d Cir. Apr. 27, 2026) (summary order) (finding that because "state law required employees to be vaccinated with no exceptions for masking or testing, these proposed accommodations would have required the hospital to violate state law and thus would have imposed an undue hardship").

Cicciari's testimony that he would have been willing to wear a mask similarly fails to raise a genuine dispute of material fact as to whether Catholic Health failed to account for possible accommodations for Cicciari's religious objection to the COVID-19 vaccine that would not have imposed an undue hardship. As the Second Circuit explained:

> [Plaintiff] argues that [defendant] should have proposed accommodations, like masking and testing, or reassignment to a remote role or position with no in-person interaction. However . . . masking or testing would not have been a reasonable accommodation, given that state law required employees in [the plaintiff's] role to be vaccinated.

*Parks v. Montefiore Med. Ctr.*, No. 25-811, 2026 WL 1782149, at *2 (2d Cir. June 22, 2026) (summary order) (internal citation omitted).

Cicciari did not request any reasonable accommodations for Catholic Health's consideration prior to his termination for failure to comply with vaccination requirements. In briefing, Cicciari does not propose *any* "possible accommodations" other than his request for remote work and simply argues vaguely that Catholic Health refused to consider alternatives. (*See generally* Opp'n.) But the record shows that Catholic Health considered and rejected Cicciari's written request—whether it constituted a request for a religious exemption from the COVID-19 vaccination requirement or a request for an accommodation of testing/masking or fully remote work—and determined that it was not feasible to grant any such exemption or accommodation.[15] (Abrusci Tr. at 22–23.) The fact that Catholic Health considered the alternative of remote work *and* that Cicciari never proffered any other alternatives to Catholic Health further undercuts his argument that Catholic Health could have, and should have, made some unspecified reasonable accommodation. *See Brown*, 762 F. Supp. 3d at 213 (rejecting a similar argument on the grounds that "[t]he Amended Complaint does not allege that [plaintiff] was amenable to anything other than the specific accommodation he requested . . . There are no factual allegations concerning his openness or qualifications for a role with Defendants that did not fall within the definition of "personnel" covered by the COVID-19 vaccination requirement"). To the extent that Cicciari maintains that Catholic Health should have revised the scope of his job responsibilities so that he was no longer required to work on-site at hospitals and

---

[15] In opposition, Cicciari asserts, "There is direct evidence that Defendant failed to engage in an individualized assessment and did not explore alternative measures to accommodate Plaintiff's religious beliefs, as admitted by the Defendant's witness (Abrusci) at deposition." (Opp'n at 10.) Cicciari fails to point to any evidence supporting this assertion, such as testimony by Abrusci. (*See id.*) As set forth above, the Court's review of the record, including Abrusci's deposition testimony, shows that Catholic Health considered Cicciari's request for an accommodation or exemption from the COVID-19 vaccination requirement and denied these requests.

other facilities with patients and medical and clinical staff, his contentions are without legal authority. "[A]n employer is not required to create a position to accommodate an employee's religious beliefs." *Brown*, 762 F. Supp. 3d 191, 214 (collecting cases).

Fourth, Cicciari relies on a handful of cases in support of the proposition that whether fully remote work is a "reasonable accommodation" is a question of fact best reserved for the jury, including *Jackson v. New York State Office of Mental Health - Pilgrim Psychiatric Center*, No. 23-cv-04164, 2024 WL 1908533 (E.D.N.Y. May 1, 2024), and *Laguerre v. National Grid USA*, No. 20-3901-cv, 2022 WL 728819 (2d Cir. Mar. 11, 2022) (summary order). (Opp'n at 12–15.) These cases are easily distinguishable. In *Jackson*, another judge in this District ruled on a motion to dismiss and found dispositive that "Defendants [did] not even address Plaintiff's requested accommodation for entirely remote work" and had therefore "failed to carry their burden to show [that] 'the face of the complaint' makes clear that allowing Plaintiff to work remotely would have imposed an undue hardship . . . ." 2024 WL 1908533, at *8. By contrast, Catholic Health has met its summary judgment burden to show, based on undisputed facts, that permitting Cicciari to work remotely would cause it to suffer an undue hardship because it would either require Cicciari to perform occasional on-site work at Catholic Health headquarters and hospitals without complying with the Vaccine Mandate or would require Catholic Health to assign these on-site duties to other staff. Moreover, the *Jackson* court found pertinent that the plaintiff had alleged that her employer "allowed her to do that work remotely for over one year before it required Plaintiff to return to in-person work," which plausibly alleged that the requested remote work accommodation did not impose an undue hardship on the employer. *Id.* By contrast, Cicciari has failed to point to any such facts in the record here, as shown by his grievances that "[d]ays after the pandemic was declared I was forced to go into a hospital to do a

non-urgent closet upgrade" and that he had been "forced to work in the office" in Melville since May 2020. (Religious Accommodation Letter.) Lastly, the *Jackson* court was considering a motion to dismiss, rather than a motion for summary judgment. And here, Cicciari has failed to meet his Rule 56(c) burden to identify "admissible evidence sufficient to raise a genuine issue of fact for trial" in order to avoid summary judgment. *McKinney*, 49 F.4th at 745–46.

*Laguerre* is also inapposite. There, the Second Circuit reversed a district court's grant of summary judgment to the employer in an ADA failure-to-accommodate claim, reasoning that whether the requested remote work accommodation "would impose an undue hardship on [the employer], [was] a material fact in dispute and one best left to the factfinder on remand." No. 20-3901-cv, 2022 WL 728819, *5 (2d Cir. Mar. 11, 2022) (summary order).[16] The Second Circuit noted that "[n]either party contends that [plaintiff] needed to be physically present to perform the essential duties of her . . . job" and acknowledged that "this case is distinguishable from those in which physical presence in the workplace was required to perform the 'essential functions' of the positions at issue." *Id.* at *3 n.4. With that understanding, it held that "[t]he record evidence support[ed] [plaintiff's] position that an effective accommodation (remote work) existed, it was plausible for [employees in her role] to work from home," where the "only evidence" that defendant provided to satisfy the burden of undue hardship was "conclusory testimony that . . . the company did not possess the requisite technology . . . ." *Id.* at *3–4. The record could not be

[16] ADA failure-to-accommodate claims are subject to different standards than Title VII claims for failure to accommodate on the basis of religion. "To establish a prima facie case [for failure to accommodate] under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) . . . his employer refused to make a reasonable accommodation." *Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d Cir. 2025).

more different here. As discussed at length, Cicciari fails to identify any evidence that raises a genuine dispute of material fact as to whether his job responsibilities required him to perform on-site work at hospitals where he was exposed to patients and medical and clinical staff and thus was subject to the Vaccine Mandate. *See* Discussion Section I.B.i *supra*. He also fails to raise a material question of fact as to whether Catholic Health would suffer an undue burden from granting him, as a senior network engineer with on-site responsibilities, a religious exemption from the Vaccine Mandate, which was prohibited by law, or permitting him to work fully remotely, such that his on-site responsibilities were left unattended or carried out by new hires in light of the demands on the network engineering team as a whole. *See* Discussion Section I.B.i *supra*. For the same reasons, Cicciari's invocation of *King v. New York State Department of Education* is similarly unavailing since the district court found the ADA failure-to-accommodate claim plausible, and did not rule on a summary judgment record with facts such as those before this court. No. 1:23-cv-1400, 2024 WL 4664280 (N.D.N.Y. Nov. 4, 2024).

## II. NYSHRL Claim

A district court "may decline to exercise supplemental jurisdiction over a claim [where it] has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Chinniah v. FERC*, 62 F.4th 700, 703 (2d Cir. 2023).

Here, summary judgment is granted to Catholic Health on Cicciari's Title VII claims, which are the only federal claims in this action. The Amended Complaint does not identify any independent basis for this Court's jurisdiction over the NYSHRL claim, such as diversity jurisdiction under 28 U.S.C. § 1332(a). (*See* Compl. ¶ 10.) Accordingly, the Court declines to

exercise supplemental jurisdiction over the NYSHRL failure-to-accommodate claim under 28 U.S.C. § 1367(c)(3).[17] *Chinniah*, 62 F.4th at 703; *see also Tang v. Grossman*, No. 22-464, 2023 WL 2229366, at *3 (2d Cir. Feb. 27, 2023) (summary order) (noting that a district court's decision to decline exercising supplemental jurisdiction "is the proper outcome when a court has dismissed all claims 'over which it has original jurisdiction'"); *Haczynska*, 738 F. Supp. 3d at 323–24 (declining to exercise supplemental jurisdiction over NYSHRL claim after dismissing plaintiff's claims under Title VII); *Brown*, 762 F. Supp. 3d at 216 (same); *Williams v. L. Offs. of Frederick K. Brewington*, No. 2:22-cv-983, 2026 WL 1706892, *22 (E.D.N.Y. June 12, 2026) (same).

**CONCLUSION**

For the reasons set forth above, summary judgment is granted to Catholic Health on Cicciari's Title VII disparate treatment and failure-to-accommodate claims. However, the Court declines to exercise supplemental jurisdiction over Cicciari's remaining New York State Human Rights Law claim under 28 U.S.C. § 1367(c)(3), and therefore this claim is dismissed without prejudice. The Clerk of Court is directed to enter Judgment and close the case.

Dated: Central Islip, New York
September 26, 2026

*/s/ Nusrat J. Choudhury*
NUSRAT J. CHOUDHURY
United States District Judge

[17] Cicciari's opposition brief advances his NYSHRL failure-to-accommodate claim on a theory that Catholic Health was "obligated to engage in cooperative dialogue or an interactive process with Plaintiff related to his need for a religious accommodation" and failed to do so. (Opp'n at 8–9.) To the extent Cicciari brings such a claim, it is dismissed for lack of jurisdiction.